*359
 
 Gaston, L
 

 A loan ofmoney was obtained by one John G. Hoskins from the late State Bank of North Carolina, by the discount at the Salisbury Branch of said bank, of a note execu ted by said Hoskins as principal and Stephen Fox and William W. Long as sureties; payable at said branch to William M. Horah, cashier thereof. Upon this note an action at law was brought by Horah in the County Court of Mecklenburg against Hoskins, Fox and Long, which action was by successive appeals of the defendants carried up to the Superior Court of that county, and thence to this court, and a judgment was ultimately obtained by the plaintiff, after a deduction of sundry payments, for a balance of $468, 19 cents with interest on $385, 62 cents, part thereof, from theFebuary Term, 1839,"of Mecklenburg Superior Court. Pending this action in the Superior Court the charter of the bank expired by its original limitation, and an attempt was there made to set up this occurrence as a legal defence; but the defence failed, because, in the language of this court, “the legal interest in the debt wasin Horah, and the action properly brought by
 
 Mm,
 
 and whether
 
 he
 
 was a trustee for the bank or any other person was an enquiry with which a Court of Law had no concern.”
 
 Horah
 
 v.
 
 Long, 4
 
 Dev. & Bat. 274. Therefore Fox, the present plaintiff, filed this bill against Horah, in which, after setting forth the death and insolvency of Hos-kins and also the insolvency of Long, and charging certain payments or equitable payments to have been made to the bank and its attorneys in full discharge of the debt, he insisted that the debt for which Horah had obtained'a judgment, was due to the bank, that its charter had expired, that thereby the said debt, if any part thereof remained unpaid, was extinguished; that Horah was not entitled beneficially to the same or any part thereof; and that it is unconscientious in him to collect it for his own benefit, and praying for an injunction. Upon the filing of the bill an injunction was granted pursuant to the prayer. The defendant put in an answer, wherein he denied the payments alleged to have been made, and admitted the expiration of the charter as charged, and insisted that he, being the legal own. er
 
 of
 
 the judgment, had a right, notwithstanding such expi
 
 *360
 
 ration of the charter, to collect the same, and declared his PurPose> when it should be collected, to apply the proceeds to the satisfaction of outstanding demands against the late corporation and the stockholders thereof. Upon the coming in of this answer the defendant moved for a dissolution of the injunction with costs. The court so decreed, and from this decree the plaintiff prayed and obtained an appeal to this court.
 

 One at least of the questions arising upon this appeal is not free from difficulty, and, so far as' we can learn, is now for the first time presented for judicial decision. Certain it is that neither our own researches nor those of the counsel have furnished any adjudications, which have a direct bearing upon it. To enable us, therefore, to come to a just conclusion, we must go back to principles in some degree elementary to endeavor to ascertain them with precision, and apply them, when ascertained, to the case before us.
 

 The late State Bank was formed by an association of individuals, under authority of Acts of the Legislature, by which they were constituted a body corporate and politic to continue until the first day of January, 1835. Though the several Acts, by which the institution was created or its powers, duties and duration declared were public acts, the corporation itself was a private corporation.
 
 Stale Bankv. Clark,
 
 1 Hawks, 36. As such it was an artificial person existing, only in contemplation of law, and having those capacities5 which its charter conferred upon it, either expressly or as incidental to its existence. Among these was the capacity to hold property of the description mentioned in its charter, as an individual, continuing its existence and preserving its identity, notwithstanding all the changes by death or otherwise, among the natural persons, of whom that body politic was formed. This capacity — and others by which a corporation is enabled to maintain its personality and identity— are sometimes spoken of as constituting a kind of “legal immortality.” It is certain, however, that the capacity to enjoy property in, succession exists only so long as the corporation exists — that if by its charter the duration of the corporation be limited, and if that duration be not extended by the sove
 
 *361
 
 reign authority, the corporation dies when the allotted term of its existence has run out — and that, before the expiration of this term, the corporation may lose its existence by forfeiture of charter, because of ascertained delinquency, or by a dissolution of the connection, by which its members had been compacted into one artificial person. We believe that the rales of the
 
 common
 
 laxo, governing the disposition of the property which the corporation held, at the moment of death are well settled — though differing according to the character of the property upon which they operate as-being either realty, personalty, or
 
 choses
 
 in action. The real estate remaining unsold reverts to the grantor and his heirs, “because (in the language of Lord Coke) in the case of a body politic or incorporate the fee is vested in their political or incorporate capacity, created by the policy of man, and therefore the law doth annex a condition in law to every such gift and grant that if such body politic or incorporate be dissolved, the donor or grantor shall re-enter, for that the cause of the gift or grant faileth.” Co. Lit. 136. Goods and chattels, by the common law, were deemed of too transitory and fluctuating a nature to be susceptible of reversionary interests after an estate for life, and, on the death of a corporation, they do not revert to the grantor or donor, but, being
 
 Iona vacantia
 
 or goods wanting an owner, they vest in the sovereign, as well-to preserve the peace of the public, as in trust to be employed for the safety and ornament of the commonwealth,
 
 dioses in action
 
 are under the operation of a different rule.— They were rights of the corporation to demand money in the hands of persons,'by whom it was withheld. They derived their existence from contracts or
 
 quasi
 
 contracts — by which the relation of debtor and creditor was created. When the' creditor corporation died — and there was no successor, no representative — the relation ol debtor and creditor ceased — and the debt became necessarily
 
 extinct.
 
 None but the creditor had a right to demand the money — and when his right is gone, the-money becomes to all purposes the money of the possessor.— These rules of the common law, except so far as they have been'modified by the Acts of our Legislature, and ex
 
 *362
 
 cepting also those cases, in which by the charters of incorporation, special provision is made in regard to the corporate property, are the law here.
 

 Very important alterations, however, have been made by our Legislature, but it is manifest that these have no application to the case, where a corporation expires by having lived out its allotted term. The Act of 1831, ch. 24 of the Revised Code, re-enacted in the Revised Statutes, chapter 26, directs how an information may be filed against a corporation existing
 
 defacto,
 
 in order to procure a judicial decision that it has forfeited its charter, or has been dissolved by the surrender of its franchises or by any other mode, and declares that on a final judgment rendered against the corporation of forfeiture or dissolution, the consequence shall not" be to extinguish the debts due to or from the corporation, but that the court rendering such judgment shall appoint a receiver, and the receiver so appointed shall have full power to collect in his name all debts "due to the corporation, to take possession of all its property, and to sell, dispose of and distribute the same in order to pay off the creditors of the corporation, and afterwards to reimburse the stockholders, under such rules, regulations and restrictions as the court rendering such final judgment shall direct. Those provisions in every part of them contemplate cases, where the termination of the
 
 legal existence
 
 of the corporation is the consequence of a judicial sentence against it. Where a corporation has lived out the term prescribed by its charter, it is
 
 de facto
 
 defunct. No judicial sentence can be" rendered against it. There were, besides, peculiar reasons, demanding this special interposition of the Legislature in cases of what might be termed
 
 premature
 
 death of the corporation. So distressing are the consequences which, according to the common law rule resulted from a judicial death or dissolution, where the corporation was one that had carried on extensive operations, that the most flagrant violations of charter, the most culpable neglects to make the necessary election of officers, delinquencies of every kind and degree might be committed, and the" public authorities would not dare to bring the questions of forfeiture or legal dissolution
 
 *363
 
 forward for judicial determination. But
 
 these
 
 provisions, by removing such distressing consequences, give freedom of action to the agents oí the community, while they remove from the managers of corporate institutions the sense of impunity that might render them regardless of law. But the consequences of a regular death by the mere efflux of time could be anticipated by all — provided against by all; and legislative interposition against them was unnecessary.
 

 There can be little or no doubt, therefore, that if the debt in this case had been contracted with the corporation, directly and by name, and the judgment thereon rendered for the corporation — the debt and the judgment would have been to all intents extinguished by the death of the corporation, and the collection thereof could not have been enforced by any legal process. But according to the terms of the original con tract, the plaintiff became bound to pay the money'to the defendant. This constituted him, and not the bank, the
 
 hgal
 
 creditor of the plaintiff. As such he has obtained his judgment, which is not extinguished by the death of the corporation, and which he has the undoubted power to collect by legal process. And this brings us to the direct consideration of the great question in the case, is it against conscience in the defendant to collect it?
 

 In presenting this enquiry w.e may dismiss from our consideration the purposes, to which the defendant professes an intention to apply the money when collected. It is not to be questioned, we think, that on the expiration of the charter, the debts of every kind due
 
 from
 
 the bank were extinguished as completelyas the debts due
 
 to
 
 it, The stockholders
 
 as such
 
 were not responsible for those debts, and the expiration of the charter,did not throw upon them any such responsibility. There are therefore no outstanding -mauds against the late corporation, or those who were stockholders therein, which in law or equity can claim to be satisfied out of the money which the defendant seeks to collect. If he collects it, he cannot be compelled to account therefor to any one, and may therefore keep it to his own use. We can pay no respect to a pretended trust, the performance or non performance of which is dependant upon the will of the
 
 *364
 
 supposed trustee. If the defendant can rightfully collect this money, it is because he has a right to collect it for his own benefit.
 

 After much consideration, we are of opinion
 
 that he has
 
 not a right to collect it for his own benefit. In the contemplation of a Court of Equity, the debt of the plaintiff, so long as it existed, and whether in the form of a note or judgment, was a
 
 debt to the Bank.
 
 The money was borrowed from the Banff, and the note given in such form as the rules of the Bank prescribed, to secure to the Bank repayment of the money so borrowed. The defendant was bare agent or trustee to collect and receive the money for the Bank. It never was intended by the contracting parties — the debtors on the one side or the creditor on the other — that he was to derive apy benefit from the transaction. It would be, we think, to sacrifice justice to technicalities, substance to form, to regard the defendant as ever having been the creditor of the plaintiff. And if he was not, it is against conscience that he should avail himself of the forms .of law to compel payment of what never was, and is not now due to him.
 

 The rights and duties which spring from the relation of trustee and
 
 cestui que trust
 
 are such as ordinarily do not affect third persons. Not being charged with the obligation of protecting those rights or of enforcing those duties, they are not usually responsible for infidelity on the part of the trustee. But when they deal with a trustee in that capacity, they may and often do contract obligations with the
 
 cestui que trust
 
 himself. If, for instance, in this case the defendant had been removed from his office of cashier, and the plaintiff v/ith knowledge of that fact and that the note was retained in Bank, had paid it to the defendant and taken his release, it cannot be doubted but that the Bank might in equity have compelled the plaintiff to pay the note to them. Yet the removal of the defendant from office would not have changed the
 
 legal title
 
 in the debt. Suit upon the note, if it had not been paid, must still, notwithstandingsuch removal, have been brought in the name of the defendant. But a Court of Equity would have made the plaintiff liable to the Bank, because, by reason of the discount of the note, the Bank became his creditor — andbecause the removal would have been
 
 *365
 
 a notification that his creditor willed the payment not to be made into the hands of one, who had been selected as trustee because of an office, which he then held, but now no longer filled. If, the moment before the Bank charter expired, the corporation had released the debt to the plaintiff, this would have extinguished it in equity, and the defendant would not have been permitted to collect it. That court in these — and in all cases where it may be material to ascertain who is the creditor — will pronounce according to the truth of the transaction, disregarding mere forms. The Bank was in truth the creditor. The note and the judgment were but
 
 securities
 
 belonging to the Bank and proper to be enforced to compel payment to the bank of what was due to it. No one could rightfully put these securities in use, but by the presumed or expressed direction of the bank. Upon the death of the bank without succession or representative, this debt became
 
 by law
 
 as completely extinguished, as it could have been by a release from the corporation. While there was a debt and a creditor, the trustee could not rightfully enforce the securities but for the payment of the
 
 debt
 
 to the
 
 credit- or.
 
 After the extinguishment of the debt he cannot rightfully enforce the securities, because there is
 
 no debt
 
 to be paid and no creditor to be satisfied.
 

 In the course of the argument, the defendant’s counsel pressed upon us with much earnestness the case of
 
 Burges
 
 v. Wheate, best reported 1 Eden’s Cases 177. The point there decided by the Lord Keeper Northington with the concurrence of the Master of the Rolls, Sir Thomas Clark, but against the opinion of Lord Mansfield, was simply that the crown, claiming by escheat, had not a right to compel a conveyance from a trustee, the trust being determined by the death of the
 
 cestui que trust
 
 without heirs. Assuming that decision to be correct, it must be upon the strict and technical doctrine, that there cannot be an escheat, while there is a tenant to render the feudal services. Upon this it was mainly rested by the Lord Keeper and the Master of the Rolls. Another ground was indeed taken that a Court of Equity will not grant a subpcena against a feoffee for one who is not in privity with the feoffor, and therefore the crown, not claim
 
 *366
 
 ing thus in privity, could not have the aid of the court. This latter ground, however, has been substantially repudiated by by subsequent adjudications. In
 
 Middleton
 
 v.
 
 Spicer,
 
 where the testator had devised
 
 chattels real
 
 to be sold and given the proceeds to his executors in trust for a charity, which trust was void because of the statutes of Mortmain, and there were no next of kin to be found, Lord Thurlow made these impressive remarks. “I do not see how this case is distinguishable
 
 in principle
 
 from Burges and Wheate. The devise vests the
 
 legal property
 
 in the executor. The question results whether the executor, being appointed only as a trustee, can take as highly as an occupant at common law. Where there is a trustee the general rule of this court is that he can have no other title.
 
 Burges dp Wheate
 
 was determined upon divided opinions, which continue to be divided, of very learned men. The argument of the defect of a tenant seems to be a scanty one. Whether that case is such an one as binds speciatim, or affords a general principle, is a nice question.” On a subsequent day, after having fully advised on the case, he decided, that the executors being trustees could not by
 
 any possibility
 
 take a beneficial interest — that being thus excluded from the beneficial interest, and no relations to be found, the creditors were as much trustees for the crown, as they would have been for any of the next of kin, if these could have been discovered.
 
 Middleton
 
 v.
 
 Spicer,
 
 1 Bro. Ch. Ca.207. The authority of this case was distinctly recognised and its principle followed out by Lord Rosslyn in
 
 Barclay
 
 v.
 
 Russel,
 
 3 Ves. 424, and by the Vice Chancellor, Sir John Leach, in
 
 Henchman
 
 v.
 
 The Attorney General,
 
 2 Sim. & Stuart 498. (1 Con. En. Chrs. Rep’ts. 559.) The decree in this last case was indeed reversed on appeal. (See 3rd
 
 Mylne & Keene
 
 485, 10th Eng. Con. Ch. Ca. 261;) but the reversal was upon a ground not at all impugning the authority of
 
 Middleton
 
 v.
 
 Spicer.
 
 There is little doubt, therefore, that, at this day in England,
 
 Burges
 
 &
 
 Wheate
 
 would not be followed, except
 
 speciatim
 
 in a case of proper escheat, and then upon the argument, “scanty” as it is, that
 
 upon feudal
 
 principles there can be no
 
 escheat,
 
 except for the defect
 
 *367
 
 of a tenant to render the feudal services. See also 4 Kent’s Com. 423-4.
 

 Perhaps neither the case of
 
 Burges dp Wheate,
 
 nor those in which the doctrine there asserted was revised, have any very close application to the question under consideration. It is not now an enquiry whether the plaintiff can call upon the defendant to execute an alleged trust annexed to property in the defendant’s hands. The plaintiff does not seek to disturb the defendant in the enjoyment of any possession he holds, upon a claim that the plaintiff has succeeded, either in
 
 the per
 
 or the
 
 post,
 
 either through or after the corporation, to the beneficial interest of the original
 
 cestui que trust.
 
 The State alone can set up such a claim; and if the property were
 
 in the defendant's
 
 hands, we do not see why it would' not be a valid claim. But the plaintiff asks of the court to prevent the defendant from taking away plaintiff’s money to which defendant has no right. And he asks this of the court as a Court of Equity, because a Court of Law is unable to look beyond the judgment und pronounce that the defendant is not a creditor. At law the judgment is absolute and conclusive evidence of title in the defendant, to money withheld by the plaintiff. In equity it is but a security for the collection of money, which ought not to be enforced, except in the futherance of the purposes for which it is held. But it seems to us that the general principles, emphatically laid down by Lord Thurlow in the ease of
 
 Middleton
 
 v. Spicer, before referred to, have a strong bearing upon the subject of our enquiry. “Where there is a trustee the general rule of this court is, that he can have no other title.” Again, “The executors being trustees cannot
 
 by any possibility
 
 take a beneficial interest.” Admit that in the case of an escheat the trustee may be permitted to insist, that the extinguishment of the trust shall operate for his benefit, the case of an escheat is then avowedly an exception from the general rule, which forbids a trustee to claim in contravention of the condition, in which he took the legal interest. Is there any sufficient reason why another exception shall be made, as is contended for by the defendant in this case?
 

 
 *368
 
 It is urged that although the defendant has no equitable title to this money, neither has the plaintiff; and therefore the court ought not to interfere but .suffer the law to prevail. Now, without repeating what has been before stated, that the extinguishment of the creditor’s equitable right annihilates the equitable debt so that plaintiff
 
 no longer owes,
 
 and therefore in equity has a perfect right to this money, it is enough that lie does not owe it to the defendant, to give him an equity against the defendant. The money is yet in the plaintiff’s hands — and he has a right to keep it against all the world, unless it be required from him
 
 by one to whom
 
 it is due, or in behalf of one to whom it is due.
 
 Melior conditio possidentis.
 

 It is also insisted that the plaintiff acted against conscience in resisting the claim, whenpreferred against him in behalf of the creditor, and delaying the suit until the charter expired and the debt was extinguished. If this be so, it does not follow that the defendant, by reason of such misconduct, became entitled to the debt thus
 
 wrongfully
 
 extinguished. The corporation might, before its charter expired, have assigned this debt to the defendant or to any other person, and thus have kept it in existence against the plaintiff. But the corporation did not so will. It preferred to die in quiet, and permit its claims and its injuries to die with it. No one can now assert the former, or redress the latter.
 

 But the resistance made by the plaintiff to the suit at Iaw} while prosecuted by the defendant for the bank, may be deserving of consideration in one point of view. The defendant may have incurred expenses in the prosecution of that suit, against which he ought to be indemnified; and while the plaintiff asks equity he should be compelled to render it. We have doubted, therefore, whether the injunction ought not to be dissolved, so far as respects the collection of the costs of the suit at law. No suggestion, however, of that kind was made upon the argument, and it seems to us that the question of these expenses is not now properly before us. The answer does not set up this equity; nor even aver that the defendant has paid, of his own moneys, or made himself personally liable to pay these costs; and it may be that they
 
 *369
 
 have been paid by the bank. As the cause must be remanded, he will have an opportunity, in such mode as he may advised, of bringing this equity, if it exist, to the notice of the court below, where, no doubt, it will receive due attention.
 

 It is the opinion of this court that there is error in the- interlocutory decree appealed from, and that upon the defendant’s answer the injunction theretofore granted ought not to have been dissolved.
 

 This opinion will be certified to the court below, and the defendant must pay the costs of the appeal.
 

 Per Curiam, Ordered accordingly.