LUTHER A. BLUE v. CITY OF WILMINGTON AND COUNCILMEN
OF SAID CITY.

(Filed 24 October, 1923.)

1. **Estate—Possibility of Reverter—Entry—Possession.**

Where land is conveyed on certain conditions upon a possibility of reverter, only the grantor and his heirs, upon condition broken, can enter and revest the estate, and, such entry being a necessary condition subsequent, it cannot be otherwise conveyed or alienated.

2. **Same—Judgment—Estoppel.**

Where one claiming the possibility of reverter in lands from the original owner has brought action to establish his right, and a final judgment has been rendered against him, upon demurrer, the judgment so rendered estops a grantee under him, claiming the same right, against the same defendants.

3. **Same—Municipal Corporations—Deeds and Conveyances—Title—Fee Simple—Qualifications.**

Where the citizens of a city subscribe the purchase price for lands to be used by the State as an encampment for white soldiers, and conveyance is made to the Governor and his successors for that purpose, but upon its cessation to be so used the title shall immediately become divested and "revert" to and vest in the board of aldermen of the city for the purpose of a public park, by this expressed ulterior disposition to the city in fee the principles affecting a reverter can have no application, and the city in that event acquires the fee-simple title. The application of the principles upon which a case or qualified fee is held void, discussed by CLARK, C. J.

4. **Trusts—Parol Trusts—Deeds and Conveyances—Grantor.**

A parol trust in lands, where a fee-simple title has been conveyed cannot be engrafted in favor of the grantor in the deed.

5. **Municipal Corporations — Cities and Towns — Title — Legislative Powers—Statutes.**

Where title to lands is conveyed to a city, to be used for the purpose of a park, no parol trust is therein created in the city, and, holding the lands subject to the legislative will, it can convey a valid fee-simple title thereto under the provisions of a statute authorizing it.

APPEAL by defendants from *Sinclair, J.,* who, upon a referee's report, modified one of the findings of fact, and affirmed the other findings of fact and conclusions of law of the referee, and rendered judgment, decreeing the plaintiff the holder of an undivided three-fifths interest in the land. Appeal by defendants.

*J. Bayard Clark for plaintiff.*
*K. O. Burgwin and E. K. Bryan for defendants.*

CLARK, C. J.   Upon the facts found, it appears that, prior to 31 July, 1889, the citizens of Wilmington, being desirous to obtain the location of a permanent encampment for the white troops of the North Carolina State Guard, appointed a committee to solicit funds from the citizens of Wilmington to purchase such site, and raised $2,500 for that purpose. The site selected was a part of an 800-acre tract of land owned by Bowden, Larkins and Alderman, from whom the committee purchased the 103 acres in controversy and caused a deed for the same to be made to the Governor of North Carolina and his successors in office.   The $2,500, the purchase price of the land so raised by the citizens of Wilmington, was paid to the said grantors, as recited in the deed.

It is recited in the deed that the parties of the first part, for and in consideration of the premises, and the further sum of $2,500 to them in hand paid by the citizens of the city of Wilmington, have bargained and sold to the Governor of the State of North Carolina and to his successors in office the land described in said deed; and after describing the tract of land, the deed recited that the land is to belong to the Governor and his successors in office so long as the above-described tract or parcel of land shall be used as a permanent encampment ground for the white troops or soldiers of the State Guard of North Carolina; but if the State encampment should ever be removed therefrom, or the said premises should cease to be used for the purposes of a permanent encampment for the white troops or soldiers of the State of North Carolina, then and in that event the title hereby conveyed, or intended to be conveyed, to the Governor of said State and to his successors in office shall immediately become divested and revert to and vest in the Board of Aldermen of the City of Wilmington for the purpose of a public park for the citizens' use and pleasure, *in fee simple.*

This was clearly a deed of bargain and sale, and, following its execution and delivery, the encampment was established upon said land, and it was used for the specified purpose of an encampment for two or three years, when its use as an encampment ground by the State was abandoned.   It is further found as a fact that on 6 December, 1892, the sheriff of New Hanover sold the interest of Bowden and Larkins in the 800-acre tract under execution to the plaintiff, Blue.

From 1892 to 1908 nothing was attempted to be done with the property by the city of Wilmington, until the Legislature passed chapter 13, Private Laws, Extra Session of 1908, which authorized the city to lease the property in controversy, and on 1 April, 1908, a lease of the property was executed to Pembroke Jones for the term of ten years for the sum of $150 per year.   Jones took possession thereof and excluded the public therefrom by enclosing the same in a fence, and used it as part of his private lodge grounds.

Some time after Blue got his deed from the sheriff, partition was made, by order of court, of the 800-acre tract of land, except the 103 acres in controversy. In. that action Blue contended for .the partition of the 103 acres also, which was denied, since which date he had had possession only of the land allotted to him in said division, which included no part of the 103 acres, though there was a very small part of the 103 acres unoccupied left outside of the Pembroke Jones fence.

About 1914, W. H. Alderman instituted suit against the city for the recovery of the 103 acres in controversy, alleging practically the same facts set out in the complaint in this action. The city filed a demurrer, upon the ground that upon the plaintiff's own showing he was not entitled to recover. The demurrer was sustained and the action dismissed. On 4 August, 1919, pursuant to resolution of the city council, made on 18 April, 1919, the city exposed the 103 acres for sale at public auction, when T. C. Daniels became the last and highest bidder thereof. The city refused to confirm the sale, and a resale was ordered by the council, but no sale seems to have been made.

On 19 August, 1919, Blue obtained a deed from W. H. Alderman for all his interest in the 103 acres in controversy. In 1921, chapter 87, Private Laws, amended the aforesaid chapter 13, Private Laws, Extra Session 1908, and authorized the city to sell the 103 acres of land in controversy in this action.

Upon the foregoing facts, the plaintiff Blue is entitled to no part of the land in controversy. By the terms of the deed, and upon the findings of fact, the land was occupied and used as a permanent encampment ground from 1889 up to and including 1892. The plaintiff does not contend that the land reverted until 1919, when the city undertook to sell the land, but he contends that at the expiration of the year 1892, when the land was abandoned by the State as an encampment, under the terms of the deed the legal title vested in the city of Wilmington and remained in it until August, 1919, when (after a lapse of twenty-seven years) it was attempted to repudiate what the plaintiff calls "the trust" by the offer to make the sale, and the plaintiff contends that the lease executed by the city to Jones was not inconsistent with the trust, and hence there was no reverter until the attempt to sell the property, even though the sale was not made. ·

Upon the foregoing facts, the plaintiff Blue did not, by the sheriff's deed in 1892, acquire the interest of Bowden and Larkins in the 103 acres, for at the time the deed was made they had no interest therein, and, at most, could have had only the possibility of a reverter, which is not transferable by deed if it had been made under the execution.

The deed from Alderman to Blue in 1919 did not convey to him Alderman's interest, if any, in this 103 acres, for Alderman could make no

valid conveyance until he had actually entered therein, and by such entry only could a forfeiture become complete; hence such entry was necessary and essential and a condition precedent to Alderman being vested with any assignable interest or right in the property. No one but the grantor or his heirs can reënter and thereby revest the estate. *Church v. Young,* 130 N. C., 8.

The Court will not lend its aid to divest the estate for a breach of condition, and the estate continues until the grantor or his heirs take proper steps by reëntry to consummate the forfeiture. *Helms v. Helms,* 137 N. C., 206.

The first assignment of error is to the ruling of the court that, as a matter of law, the possession of Pembroke Jones under the lease from the city was not adverse and inconsistent with the trust which the plaintiff contends was declared under the deed from Blue and others to the Governor and the city of Wilmington. If the attempt by the city to sell the property, which sale was not consummated, was inconsistent with the alleged trust in the deed of 1889, then the leasing of the property to Jones, which expressly allowed him to exclude the citizens from using the ground as a public park, was as much a breach of the condition subsequent (if any), and as effectual, as the attempt of the city to sell to Daniels, for the lease of ten years excluded the use by the citizens as a public park as effectually as a deed would have done.

The second assignment of error is to the holding by the court that the judgment in 1908, sustaining the demurrer in the action by Alderman against the city in 1908, was not *res judicata.* Even if there had been a possibility of reverter, such possibility was not assignable and could not be conveyed until after reëntry made by the grantors or their heirs and the reverting estate had become vested by completed forfeiture. *Hollowell v. Manly,* 179 N. C., 265; *Helms v. Helms,* 137 N. C., 209; *Church v. Young,* 130 N. C., 8. The plaintiff, therefore, could not acquire the title to the reverting interest (if there were such) of Bowden and Larkins under the deed of the sheriff of the 800-acre tract, nor did Alderman acquire the Larkins' one-fifth, because, under the finding of fact and the complaint in the Alderman suit, the reverter had not occurred.

The reverter, if it ever occurred, vested title in Alderman in 1908, and the fact that he brought suit against the city, claiming this land, and the demurrer to Alderman's complaint, which was sustained by the court upon the ground that he had no title, estops the plaintiff to the same extent and with like effect as though Alderman had brought this suit instead of his assignee.

In *Bank v. Dew,* 175 N. C., 79, it was held: "A judgment sustaining a demurrer to the pleadings upon the merits, while it stands unreversed,

is conclusive as an estoppel in another action brought between the same parties (or their successors in title or interest) upon the same subject-matter." To the same purport are *Swain v. Goodman,* 183 N. C., 531; *Hayden v. Hayden,* 178 N. C., 262; *Ferebee v. Sawyer,* 167 N. C., 199.

The third assignment of error is to the ruling of the court in holding as a matter of law that the act of the city in attempting to sell the property amounted to a renunciation of the terms of the trust under the deed to the Governor and city of 31 July, 1889, and that because of such act a reverter occurred to the grantors or their heirs.

We have discussed these matters because they have been raised and argued by counsel; but in fact we think that there is but one real question at issue, and that is whether the deed of 1889 was in any sense a trust in favor of the grantors. As we understand the deed, it was a grant in fee simple to the Governor for the consideration of $2,500 raised and paid for by the citizens of Wilmington, and in consideration thereof there was an absolute grant in fee simple of said 103 acres marked off, allotted and described by the deed, to be held for the use of an encampment for the white troops of North Carolina, and there is no evidence of an oral trust in favor of the grantors under which they are entitled to claim any reservation of a trust or other interest in their behalf. They parted absolutely with the 103 acres for the purposes therein stated, and recited that it was in fee simple. It was provided only that if the property should cease to be used for the original purpose of an encampment for State troops, it should revert, not to the grantors, but "shall immediately become divested and revert to and vest in the Board of Aldermen of the City of Wilmington for the purpose of a public park for the citizens' use and pleasure, in fee simple." To give to the word "revert" the technical meaning of a reversion to the grantors contradicts this expressed purpose of the conveyance.

This was a condition subsequent, dependent upon the abandonment of the property for the beneficial use of the State, and then that it should revert, *i. e.,* that it should change its beneficent use and should become the property of the city, not only to be used for a particular purpose, but that the city should own it *in fee simple.*

The fact that such intention was so clearly and unmistakably expressed that, upon the contingency that if the State should abandon it, the property should belong to the city, is conclusive that there was no possibility of a reverter from the city, for it is declared emphatically that the city in such contingency should take title in fee simple. *R. R. v. Carpenter,* 165 N. C., 465.

The contention of the plaintiff rests upon the misconception that the use of the word "reverter" is in its technical sense, but this loses sight of the fact that the context is explicit that in the event the land should

cease to be used as an encampment by the State, "then and in that event the title shall be divested and revert and vest in the Board of Aldermen of the City of Wilmington for the purpose of a public park for the citizens' use and pleasure in fee simple." This shows no intent that there should be a reverter in any event to the grantors, but directs where the title shall go in the event the State should cease to use the property. There is no express trust and no evidence of an oral trust beyond the shadowy suggestion that the grantors might have asked a higher price if it had been sold for any other purpose. Besides, if there had been evidence or an oral trust in favor of the grantors, it would have been void, because in contradiction of the express terms of the conveyance in fee simple, and there is no allegation of a mutual mistake in drafting the paper.

In *Gaylord v. Gaylord,* our leading case on this subject (150 N. C., 222), is a very clear and able opinion by *Mr. Justice Hoke,* and holds that the "seventh section of the English Statute of Frauds, which forbids the creation of parol trusts or confidences in land, etc., unless manifested and approved by some writing, has not been enacted here, but such trust cannot be set up or engrafted in favor of the grantor upon a written deed conveying to the grantee the absolute title of lands and giving clear indication on the face of the instrument that such title was intended to pass. The doctrine of engrafting by parol a trust upon lands conveyed by deed is subordinated to a well-recognized principle of law, that such trust cannot be established by the parties in favor of a grantor in a deed when the effect will be to contradict or change by contemporaneous stipulations and agreements, resting in parol, a written contract clearly and fully expressed." This proposition is elaborated and clearly supported by numerous authorities cited *ib.,* at pp. 226 *et seq.* It is summed up by this statement on p. 226 : "This doctrine of a trust or use resulting to a grantor, when there was no consideration paid, was a rule of the common law, incident chiefly to conveyances of feoffment, and never obtained when there was a contrary declaration made by the grantor at the time of the conveyance, either oral or written, and in the rare instances where the doctrine is applicable to written instruments it is never allowed to prevail when there is a contrary intent clearly expressed in a written deed."

This case is supported not only by the precedents quoted therein, but has been often quoted, and is the settled law since. *Jones v. Jones,* 164 N. C., 322; *Campbell v. Sigmon,* 170 N. C., 351, in which last it is said: "Indeed, if, notwithstanding the solemn recitals and covenants in a deed, a grantor could show a parol trust in himself, it would virtually do away with the statute of frauds and would be a most prolific source of litigation. No grantee could rely upon the covenants in his deed. It is

true that the recital of the amount of the consideration, or of its receipt, can be contradicted in an action to recover the purchase money, but that is because it is no part of the conveyance." *Barbee v. Barbee,* 108 N. C., 581, and citations thereto in the Anno. Ed.

*Gaylord v. Gaylord* has also been cited and approved by *Allen, J.,* in *Walters v. Walters,* 171 N. C., 313, saying that "a parol trust cannot be engrafted in favor of the grantor upon a deed conveying the absolute title to the grantee." This last case was cited and approved in *Walters v. Walters,* 172 N. C., 330, and in *Swain v. Goodman,* 183 N. C., 534. The authorities to the same effect as *Gaylord v. Gaylord* will be found fully collected in the notes to 39 L. R. A. (N. S.), at pp. 905, 912, and 916.

As to the language of a deed, it has been held that a provision in a deed of land to a county that it is to be used "as and for county high-school grounds and premises, does not create a condition subsequent which will entitle the grantor to reënter if the county attempts to sell the property." *Fitzgerald v. Murdoc County,* 164 Cal., 493; 44 L. R. A. (N. S.), 1229. To same purport, *McElroy v. Hoke,* 153 Ky., 108; 44 L. R. A., 1220, and notes thereto.

In *School Committee v. Kesler,* 67 N. C., 443, it was contended that where the conveyance had this qualification, "as long as the system of common schools shall be continued at that place, or as long as it shall not be applied to any other purpose except for schools of any kind," that this was a "base or qualified fee so long as the then existing system of public schools should be in force, and that the estate terminated, by its own limitations, when the system of common schools was changed and a new system was adopted." Even that proposition, if correct, would not be valid here, for the condition is that when the State ceased to use this property it should be divested and pass to the city of Wilmington, whose citizens had furnished the money for the purchase of the property, but even in that case *Pearson, C. J.,* held that "a base or qualified fee has never been in use or in force in this State or recognized by its laws, and a condition or qualification in a deed conveying an estate to a school committee 'as long as the system of common schools shall be continued,' etc., is contrary to public policy, repugnant and inconsistent with the nature of the grant, and, therefore, void." In that opinion, *Chief Justice Pearson* further says: "There has been but one instance of a 'base or qualified fee' in this State. That is the case of the Cherokee tribe of Indians in the western part of the State. The tribe was permitted to hold the land so long as it continued to occupy the territory," and the *Chief Justice* added: "It would be something new under the sun if the addition of a few unnecessary words in a deed of Tobias Kesler to a school committee, for a quarter of an acre of land, of the value of $1,

can have the legal effect to revive this obsolete estate, which has never been 'in force or in use' in this State or recognized by its laws." This case has been often cited since. See citations thereto in the Anno. Ed.

To repeat, the language of the deed is that, in the event of the land ceasing to be used as a permanent encampment for the white troops of the State, "then and in that event the title shall be divested and revert to and vest in the Board of Aldermen of the City of Wilmington, for the purpose of a public park for the citizens' use and pleasure, in fee simple." Manifestly, the words there used not only negative a reverter to the grantors or their heirs, but convey the clearly intended idea that in such contingency the city was to take an unconditional, absolute estate in fee, free from all contingencies and possibilities, in full recognition of the words, "in fee simple." *Church v. Bragaw,* 144 N. C., 133.

The court below erred in its conclusion of law that the plaintiff was entitled to ownership or any interest whatever in the land sued for.

The words in the deed, that on the happening of the condition subsequent of the abandonment of the property by the State as an encampment ground, the property "shall immediately become divested and revert to and vest in the Board of Aldermen of the City of Wilmington, for the purpose of a public park for the citizens' use and pleasure, in fee simple," was not a trust imposed on the city for that purpose, but an absolute conveyance in fee simple, as if the city had bought it direct from the grantors for that purpose, and, therefore, the act of the Legislature was amply sufficient to authorize the city to sell and convey the property, free of any limitations or trust. "The legislative power, unless restricted by the Constitution, is absolute as to control over the property of municipal corporations held by them for a public use." *Potter v. Collis,* 156 N. Y., 15; 59 L. R. A., 407. The Legislature has power to authorize the discontinuance of parks and sale of park property, the fee of which is in the city, when no private property is taken. *East Chicago Co. v. City of East Chicago,* 85 N. E., 783.

"It has been held that, although title to the land within a city forming a public park is vested in a city, the control of the public park belongs primarily to the State. Such parks are held, not for the sole use of the people of a particular city, but for the use of the general public, which the Legislature represents. By virtue of its control over the public parks, the Legislature possesses the power to authorize the city to devote it to a use which is inconsistent with park purposes, so long as such inconsistent use is some other and higher public purpose which will render its enjoyment by the public more extended and general." (In that case the Legislature, in authorizing the sale of the property, specified how the proceeds should be applied.) 1 Dillon Municipal Corporations, 5th Ed., sec. 117; 19 R. C. L., 763.

Upon these facts, certainly, it is immaterial whether or not the grantors, moved by a patriotic purpose, sold the 103 acres to a committee of their fellow-citizens at a price less, or more, than what could have been obtained from others. The purchase was made at a stipulated price, duly acknowledged as paid in full for the property expected to be used by the State, and if it should cease to be so used, then for a reverter, not to the grantors, but for the use of the city, and a subsequent act of the Legislature has authorized the city to make sale of the same and apply the proceeds to other uses.

There was no trust imposed upon the conveyance in favor of the grantors, nor was there any condition subsequent in their favor.

The inevitable conclusion is that, under the terms of the deed of 1889, the original grantors were divested of all title or interest, and that the defendant, the city of Wilmington, under the facts found by the referee, as modified by the judge, holds an estate in fee simple, subject only to the power of the Legislature to authorize the sale, or other disposition of the property, in the event that the city still continues to hold the property, subject to the use mentioned in the deed of 1889.

Reversed.