THE UNIVERSITY OF NORTH CAROLINA v. THE CITY OF HIGH POINT.

(Filed 23 November, 1932.)

1. **Wills E b—Devise in this case held to convey fee simple title to lands to incorporated town.**

    A devise of lands to an incorporated town, describing same, and thereafter stating that the lands be kept for its comfort and to protect its health and for suitable grounds for public buildings, the meeting house thereon to be held more especially for the use of the Society of Friends and generally for the use of religious denominations, conveys the fee-simple title to the town unencumbered by a trust or condition subsequent which would work a reversion of the lands to the grantor, the later clauses not being repugnant to the fee previously granted.

2. **Escheat A b—Land held by incorporated town held to escheat upon repeal of town charter under the facts of this case.**

    Where an incorporated town is devised lands in fee simple unencumbered by a trust or condition subsequent, and thereafter the town charter is repealed by the General Assembly, the lands so devised to the town escheat to the State, and under the provisions of our statute to the University of North Carolina, Art. IX, sec. 7, C. S., 5784, the town having the fee-simple title to the property and having no debts at the time of its dissolution, and the lands not having been purchased for other than strictly governmental purposes, and the General Assembly not having undertaken to dispose of the property. The history of escheat in the light of the doctrine of the old English feudal tenures and of its present significance discussed by *Stacy, C. J.*

**3. Municipal Corporations A f—Upon repeal of municipal charter no trust attaches to its lands for benefit of community.**

Where the charter of an incorporated town is repealed by the General Assembly the lands formerly held by the town in fee is not fastened with a trust in favor of the local community.

**4. Municipal Corporations A b—Legislature has authority over municipal property and may dispose of it upon repeal of municipal charter.**

The General Assembly has authority to deal with property held by a municipal corporation for a public purpose and to provide for its disposition upon the repeal of the municipal charter.

**5. Escheat B c—3 C. S., 5784, applies to proof and not to pleadings in action by University claiming lands by escheat.**

The provisions of C. S., 5784(a), applies only to proof and not to pleadings, and its provisions may not be taken advantage of by a demurrer to the pleadings.

APPEAL by plaintiff from *Shaw, Emergency Judge,* at February-March Term, 1932, of GUILFORD.

Civil action in ejectment, heard upon demurrer.

The complaint alleges:

1. That the plaintiff is a corporation vested with title to all property accruing to the State from escheats.

2. That the town of Jamestown, located near the confluence of the north and south forks of Deep River in Guilford County, was chartered by act of Assembly, 1858-1859, under which the "commissioners of Jamestown," and their successors in office, were created a body politic with the right to take, hold and sell property, etc.

3. That under the will of George C. Mendenhall, duly probated in 1860, about six acres of land situate near the south fork of Deep River, the property of said testator, was devised as follows:

"I give and devise to the commissioners of the corporation of Jamestown and their successors in office all the land within the following boundaries, to wit: (Description). The same to be kept for the comfort and held to protect the health of the town and for suitable grounds whereon to erect any buildings for public use, and the brick meeting house thereon to be held more especially for the use of the Society of Friends and generally for the use of all religious denominations who profess the religion of Jesus Christ—and said land, grove, meeting house and graveyard to be under the direction of the commissioners of the corporation of Jamestown and their successors."

4. That the charter of the town of Jamestown was repealed by the Legislature in 1893, and that the said town and its people have since been without corporate existence.

5. That the tract of land in question was never conveyed or in any manner aliened by the "commissioners of Jamestown," and the same has escheated to the University of North Carolina.

6. That the defendant is in the unlawful possession of said property, and has damaged the same, by ponding water thereon, to the extent of $2,500.

Demurrer interposed on the ground that the complaint does not state facts sufficient to constitute a cause of action; demurrer sustained; plaintiff appeals, assigning error.

*Attorney-General Brummitt, Jos. B. Cheshire, Jr., escheator, Leland Stanford and R. D. Dickson for plaintiff.*
*G. H. Jones for defendant.*

STACY, C. J. It is alleged that the plaintiff is the owner by escheat of the *locus in quo,* that the defendant is wrongfully in possession thereof, and this is admitted by the demurrer.

True, the validity of plaintiff's title is, in part, made to depend upon the construction of a clause in the will of George C. Mendenhall.

That a fee-simple was devised to the commissioners of the corporation of Jamestown, unencumbered by a trust or condition subsequent, such as to work a reversion of the title, would seem to follow from what was said in *Tucker v. Smith,* 199 N. C., 502, 154 S. E., 826, *Hall v. Quinn,* 190 N. C.; 326, 130 S. E., 18, *Blue v. Wilmington,* 186 N. C., 321, 119 S. E., 741, *Brittain v. Taylor,* 168 N. C., 271, 84 S. E., 280, *Church v. Young,* 130 N. C., 8, 40 S. E., 691. There is nothing in the clause, following the description, at variance with or repugnant to the fee previously devised. No disposition of the property was made by the Legislature at the time of the repeal of the charter of the town of Jamestown, nor has any subsequently been undertaken.

Assuming, therefore, that the commissioners of the corporation of Jamestown took a fee under the will of George C. Mendenhall, the question occurs: Did this property as a matter of law escheat to the State, and become vested in the University, upon the repeal of the charter of the town of Jamestown in 1893? We think it did. *Meriwether v. Garrett,* 102 U. S., 472. The agency of the municipal corporation ceased with the repeal of its charter, and all the property held by it for public purposes passed under the immediate control of the State. *Alexander v. Garcia,* 168 S. W. (Tex. Civ. A.), 376.

In the Texas case, just cited, the third head-note, which accurately digests the opinion, is as follows:

"In 1810 the Spanish government established the town of Palafox, granting to it four leagues of land. In 1818, the town was completely destroyed by Indians, and most of the inhabitants killed, and remainder abandoned the town, and for more than 65 years there was a complete abandonment of the town. More than 50 years after such abandonment defendants 'squatted' on the land. Held, that upon abandonment of the town all parts of the grant not having been conveyed by the town to individuals reverted to the Spanish government, and hence passed and became a part of the public domain of the state of Texas by the treaty of Guadalupe Hidalgo, and, being such, defendants could not acquire title to any part thereof by limitations."

This case, however, dealt with lands originally granted to a town by the Spanish government for municipal purposes, and it is contended that the doctrine of reverter under the Spanish law is not after the similitude of an escheat, as the property was not granted to the town in fee in the first instance.

In *Lilly v. Taylor*, 88 N. C., 489, the question arose as to whether property held by the town of Fayetteville for public uses, such as public buildings, streets, squares, parks, wharves, landing places, and generally property held for governmental purposes, could be subjected to the payment of the debts of said municipality, at the instance of creditors, after the repeal of its charter. It was held that the public character of such property forbid its appropriation for this purpose, and the Court added: "Upon the repeal of the charter of the city such property passed under the immediate control of the State, the power, once delegated to the city in that behalf, having been withdrawn." The cases of *Meriwether v. Garrett, supra,* and *Wallace v. Trustees,* 84 N. C., 164, are cited as authorities for the position.

It is provided by C. S., 5784—a statute enacted pursuant to Article IX, section 7, of the Constitution—that all real estate which has heretofore accrued to the State, or shall hereafter accrue from escheats, shall be vested in the University of North Carolina, and shall be appropriated to the use of that corporation. It was said in *Gilmore v. Kay,* 3 N. C., 108, "The word *escheat,* as used in our act of Assembly, embraces every case of property falling to the sovereign for want of an owner"; and in *Trustees v. Gilmour,* 3 N. C., 129, "The act giving escheat lands to the University meant to substitute the University in the place of the public in regard to all such real property as fell to the State for want of heirs capable to take."

Again, speaking to the subject in *University v. Johnston,* 2 N. C., 373, it was said:

"It was argued for the university that it would probably be objected on the part of the defendant that there were no escheat lands in North Carolina, escheat being a consequence of feudal tenure, one of the conditions of which was that when the heritable blood of the tenant failed through want of relations, or by corruption of blood, that the feud should fall back to the lord. It must be admitted that was the correct idea of escheat, yet it is to be observed that this word having been used by the Legislature so late as 1789, where they speak, too, of lands thereafter to escheat, must have been understood by them to represent some other idea than that of escheat according to its strict technical meaning. They intended the act should have some effect; and one sense in which this word is sometimes used even in the old books, is this: the accidental and unexpected falling of lands to the lord for want of heirs. Another sense is, when those who held of the king (or public) die leaving no heirs, and the lands relapse *in fiscum*. Co. Litt., 13, a. In this sense it is used in the act, and signifies that the university shall be entitled to all such lands as have been once appropriated, but by some accident have been left without any legal proprietor—no matter by what means they came into this situation, whether by a dying without heirs or by becoming an alien to the government, as was the case with many upon the adoption of a new form."

Without undertaking to follow the line of escheat from its initial rise in feodal tenure as a strict reversion to substantially a caducary possession *ab intestato* which it later became (*Burgess v. Wheate,* 1 Eden's Cas., 177), it is sufficient to say that whereas originally the law gave the escheat for want of a tenant to render feudal service, *propter defectum tenentis,* it now gives it for want of an owner or rightful claimant. *Fox v. Horah,* 36 N. C., 358; *Gilmour v. Kay, supra.* At one time privity between feoffor and feoffee was thought to be essential, afterwards the Crown came in on failure of heirs as *parens patriæ.* Note, 29 Am. Dec., 232. The word "escheat" is derived from the French, and originally signified the falling of lands by accident to the lord of whom they were holden, in which case the fee was said to be *escheated.* The escheat was not always to the Crown, as a fee might be holden either from the Crown or from some inferior lord. At feudal law escheat was the right of the lord of the fee to reënter, upon the estate becoming vacant by extinction of the blood of the tenant, either *per defectum sanguinis* or *per delictum tenentis.* But the word "escheat" in this country, at the present time, "merely indicates the preferable right of the state to an estate left vacant, and without there being anyone in existence able to make claim thereto." Note, 29 Am. Dec., 232. Lands, so left vacant, it is said, sink back into their original condition of com-

mon property for the general benefit. *Sands v. Lyndham,* 27 Gratt., 295, 21 Am. Rep., 348. See, also, *In re Neal,* 182 N. C., 405, 109 S. E., 70.

"By the law of England, before the Declaration of Independence, the lands of a man dying intestate and without lawful heirs reverted by escheat to the King as the sovereign lord, but the King's title was not complete without an actual entry upon the land, or judicial proceedings to ascertain the want of heirs and devisees. *Atty-Gen. of Ontario v. Mercer,* L. R., 8 App. Cas., 767, 772; 2 Bl. Com., 245. . . . In this country, when the title to land fails for want of heirs and devisees, it escheats to the state as a part of its common ownership, either by mere operation of law, or upon an inquest of office, according to the law of the particular state." *Hamilton v. Brown,* 161 U. S., 256, reported in 40 L. Ed., 691, with valuable note. See, also, *University v. Foy,* 5 N. C., 58, and *University v. Harrison,* 90 N. C., 385; Annotation, 79 A. L. R., 1364.

The common-law doctrine that real estate held by a private corporation at the time of its civil death, forfeiture, repeal, or expiration of its charter, reverted to the grantor or his heirs was recognized in *Fox v. Horah,* 36 N. C., 358, but this was overruled in *Wilson v. Leary,* 120 N. C., 90, 26 S. E., 630, and again disapproved in *Broadfoot v. Fayetteville,* 124 N. C., 478, 32 S. E., 804. See Annotation, 47 A. L. R., 1288.

Mr. Dillon in his work on Municipal Corporations, sec. 112 (68a), gives it as his opinion that the legislature is without power to deprive the people of the locality of the enjoyment of property held by a municipality. He says: "It is in effect fastened with a trust for the incorporated municipality as long as the Legislature suffers it to live, and for the benefit of the people of the locality if the corporate entity which represents their rights shall be dissolved." But Mr. Dillon's view, as thus broadly expressed, is not supported by the authorities. 43 C. J., 175; 10 R. C. L., 608. He cites none for his position.

It is suggested that while property held by a municipality for governmental purposes passes under the immediate control of the State upon the repeal of its charter, such passage is not by way of escheat, but by investiture under the title held by the municipality at the time of its dissolution, especially where only the use was acquired by dedication or condemnation. 8 R. C. L., 910. Here, the *locus in quo* was acquired in fee by purchase and not merely its use by dedication or condemnation.

To accept the suggestion of investiture under the original devise, and reject that of escheat, as applicable to the facts of the present record would be to constitute the State the ultimate taker in remainder of all such property granted or devised to a municipal corporation. This would

be an innovation in the law hitherto unknown. *Bond v. Moore,* 90 N. C., 239.

On the other hand, if only the control of such property passes to the State, upon the repeal of a municipal charter, the title thereto would remain *in nubilus,* like Mahomet's coffin,

"In Aladdin's tower
Some unfinished window unfinished must remain,"

which perhaps a squatter might acquire, but which the University could not take. This likewise would be a Don Quixote estate, hitherto unknown to the law.

Lastly, it is suggested that such property passes under the immediate control of the State fastened with a trust in favor of those for whom the municipality originally held it. But there are no inhabitants of the town of Jamestown, and it is not after the character of a fee to become a trust estate upon failure of takers. If it were, escheats would never have come into being. Furthermore, a trust without a *cestui que trust* must fail. *Thomas v. Clay,* 187 N. C., 778, 122 S. E., 852; *Trust Co. v. Ogburn,* 181 N. C., 324, 107 S. E., 238; *Keith v. Scales,* 124 N. C., 497, 32 S. E., 809; *Bridges v. Pleasants,* 39 N. C., 26 ("foreign missions," "home missions" and "poor saints" held too indefinite). It was held in *Highland Grove Township v. Winnipeg Junction,* 125 Minn., 280, 146 N. W., 974, that a township which embraced the site of a dissolved municipality was not entitled to its funds or property in the absence of a statute so providing, thus rejecting the idea of a trust in favor of the local community.

It is true the doctrine of escheat has had to accommodate itself to the evolutionary process in order to meet the changes in government and institutional life, but its vitality has neither waned nor ebbed along the way. The causes of its birth were such as to give it sustained existence. The doctrine remains as well as the necessity out of which it arose. Its preservation is salutary, and its application to the facts of the present record—to care for an unexpected windfall as it were—would seem to be more in keeping with the precedents than the inhospitable innovations above mentioned.

When property of the character we are now considering becomes vacant *propter defectum tenentis,* or ownerless, and, for this reason, the law returns it to the source from whence it came—formerly the King, later the State—such return apparently comes within the meaning of an escheat. It passes under the immediate control of the State, relapses *in fiscum* as it were, or sinks back into its original condition of common

property for the general benefit. *Sands v. Lyndham, supra.* Even if the original conception of an escheat did not embrace such relapse *in fiscum* of municipal property, the enlarged significance of the term as used in the statute would seem to be broad enough to include it. *University v. Johnston, supra.*

Perhaps it should be observed that we are not now dealing with property which has been purchased by a municipality for other than strictly governmental purposes, such as waterworks, lighting plants, street railways, etc., which may be subject to peculiar considerations. 43 C. J., 175. Nor are we considering property conveyed or devised to a municipality in trust, or on a condition subsequent, such as to work a reversion to the grantor, donor, devisor, or his or her heirs. *Mormon Church v. U. S.,* 136 U. S., 1.

It should also be observed that upon the repeal of the charter, there were no outstanding obligations of the municipality, or debts to be paid, and the General Assembly did not undertake, either proximately or remotely, to make any disposition of the property now in suit (*Highlands v. Hickory,* 202 N. C., 167, 162 S. E., 471); nor is it of such character that the commissioners of Jamestown could not have disposed of it at will prior to the dissolution of the municipal corporation. *Hall v. Quinn, supra.*

The General Assembly has ample authority to deal with property held by a municipal corporation for public purposes, and to provide for its disposition upon the repeal of the municipal charter, in which case, it would seem, the question presently debated could not arise. *Highlands v. Hickory, supra; Hasty v. Southern Pines,* 202 N. C., 169, 162 S. E., 480; *Torrence v. Charlotte,* 163 N. C., 562, 80 S. E., 53; *Montpelier v. East Montpelier,* 29 Vt., 12.

The decisions in *Smith v. Dicks,* 197 N. C., 355, 148 S. E., 464, and *Broadfoot v. Fayetteville,* 124 N. C., 478, 32 S. E., 804, cited and relied upon by defendant, are not presently helpful to its position. The rights of creditors of the civilly dead village of Jamestown are not involved in the present proceeding, as there were none. *Smith v. Comrs.,* 182 N. C., 149, 108 S. E., 443.

Nor can the provisions of 3 C. S., 5784(a) avail the defendant on demurrer. This statute deals with proof, not pleading.

Reversed.